**Gideon I. GARTNER, Plaintiff-Appellee,**

v.

**James R. SNYDER, Defendant-Appellant,**

**and**

**Kingdon R. Westerlind, and Snyder-Westerlind Enterprises, Inc., Defendants.**

**Cal. No. 12, Docket 78–7641.**

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1979.

Decided Oct. 10, 1979.

---

Martin Mushkin, New York City (Philips & Mushkin, P. C., New York City, of counsel), for plaintiff-appellee.

Edward S. Rudofsky, New York City (Zane & Teitler, New York City, Edward L. Schiff, New York City, of counsel), for defendant-appellant.

Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

James R. Snyder appeals from the judgment of Judge Knapp of the Southern District of New York, entered on July 18, 1978, holding him personally liable for the breach by Snyder-Westerlind Enterprises, Inc. (Enterprises) of a contract to sell real property to the plaintiff, Gideon I. Gartner.[1] The court had jurisdiction under 28 U.S.C. § 1332, because Gartner was a resident of New York, Snyder was a resident of New Jersey, and Enterprises was incorporated and principally doing business in New Jersey when suit was filed. Snyder argues that Judge Knapp erred in looking beyond Enterprises' corporate form to impose liability, in disregarding a contract clause that specified return of downpayment as Enterprises' sole liability for failing to convey title as promised, and in calculating Gartner's loss according to the value the property would have had if the contract had been fulfilled, rather than the value the property had at the time of the breach. We reverse the imposition of personal liability.

By a contract dated January 4, 1972,[2] Gartner agreed to buy and Enterprises agreed to build and sell a triplex townhouse in a development known as Hunter Highlands, in Hunter, New York. The contract price for Gartner's townhouse, Unit C–21, was $45,500; Gartner made a $4,550 downpayment. A rider to the contract set December 15, 1972 as the completion date. If Enterprises was "unable to deliver title" on that date, its sole liability, according to paragraph 16, was to refund Gartner's downpayment.

Enterprises was controlled by Snyder and Kingdon Westerlind, as were two other corporations Snyder and Westerlind used to develop the Hunter Highlands project: Snyder-Westerlind Development, Inc. (Development) and Snyder-Westerlind of Hunter, Inc. (Hunter). As we explain more fully below, these three corporations acted as

---

1. Judge Knapp had previously entered a default judgment on May 20, 1975 against Snyder, Enterprises, and Kingdon Westerlind.

2. Although Gartner actually signed the contract sometime in February or March 1972, it was dated January 4, 1972, like those of the approximately seventeen other purchasers. Snyder could not explain why the contracts were all dated as of that date.

one. For instance, Hunter Highlands was initially advertised under Development's name, although the brokerage agreement that governed advertising was signed in Enterprises' name. Preliminarily, therefore, we use "the project" to refer to the actions of any of the three corporations or of Snyder.

The project began its sales campaign in November 1971, and almost immediately encountered major difficulties. Its first was a confrontation with the Securities and Exchange Commission. On December 16, 1971, it received a warning from the SEC's Regional Office in New York City that, because the project advertised that its developer would rent the units while the owners were away and thereby generate for the owners rental income, it was proposing an investment that fell within the federal securities laws' concept of a "security." The project had not filed a registration or prospectus, and was therefore, the SEC warned, violating the law. The project referred the letter to its counsel, John Fromer, an attorney who had previously done the legal work for a similar housing development. On December 27, Fromer wrote to the SEC that in his opinion the project was not selling securities, and that the New York Attorney General had expressed similar concerns under New York law but had agreed after some discussion that the project was only selling real estate, not intangible interests. Nonetheless, Fromer said, the project would revise its advertising to avoid any confusion. Fromer must still have believed that some problem existed, however, for on January 13, 1972, when he withdrew as the project's counsel to avoid an unrelated conflict of interest, he suggested that it "immediately hire an experienced firm to advise [it] on the 'sale of securities' question." After first consulting another local attorney, the project retained its present counsel, Edward Schiff, on April 1. During this time, it had continued to make sales.

In April, Schiff communicated with the SEC, and in his April 20 request for a "no-action" letter he outlined the steps that the project, now developing under Enterprises' name, would take to dispel the SEC's concerns.[3] First, the project would no longer offer to rent the units for owners. Second, and more important, it would sell the units as condominiums rather than in fee simple. This change would significantly reduce the prospect that buyers would seek rental income, for condominium owners, because they share an undivided interest in all common areas and grant to a managing board of owners a right of first refusal upon any renting or leasing, have less freedom to rent than do owners in fee simple. Furthermore, the project said that it would offer rescission and restitution of downpayment to those who had already signed contracts to buy. Schiff sent this request to the SEC on April 20. On Schiff's orders, the project's broker, C.A.S. Enterprises, Inc. (CAS) suspended sales on May 1.

The project received its no-action letter on July 20. Beginning in November, and continuing until March, 1973, the project offered Gartner the option (1) to rescind his contract and receive back his downpayment, (2) to buy the triplex Unit C–21 for $69,000, or (3) to buy a duplex unit for the original price of $45,500. Gartner refused, demanding instead that his contract be fulfilled.

The second major roadblock to the project's completion arose in July 1972. CAS, which had been involved in a similar project in Hunter before, had advised the project in September 1971 not to begin sales until it had obtained all necessary building, water, and sewage permits. The project did not follow that advice. On July 19, when the Department of Environmental Conservation held a hearing to consider the project's proposal for a $50,000 water and sewage system, local trout-fishing organizations who feared that the proposed system would harm local waters so vigorously op-

---

3. The SEC staff customarily sends a no-action letter to an inquirer who has questioned whether some transaction violates the securities laws if, upon the facts presented to it and upon the assumption that the transaction will be performed as described, it has decided not to recommend that the Commission take any action.

posed the plan that the project withdrew its application. On September 6, the Department dismissed the application without prejudice. The project then obtained a 1.5 million dollar mortgage from Port Jervis Savings and Loan Association in the hope that a more elaborate system would be acceptable, but it still could not obtain the permits. The Department of Environmental Conservation was just at that time assuming the regulating authority over such permit applications, which had previously been vested in the Department of Health, and had no criteria for determining acceptability. The project did not obtain a water permit until September 1973; the bank, which foreclosed on the project's mortgage in 1974, did not obtain a sewage permit until February 1977, after spending $400,000 for a different design.

As mentioned before, the Hunter Highlands project was developed under at least three different corporate names. Initially, it was Development that advertised the project and that received the SEC's warning. However, in November 1971, it was Enterprises that hired CAS to sell units of the project, and that hired Northern Tech-builders to construct the project's models. It was on behalf of Enterprises that Schiff requested the no-action letter. In autumn 1972, it was Hunter that obtained the mortgage from Port Jervis Savings and Loan Association; and Hunter obtained the water permit in September 1973.

The project kept all its documents in one file, and kept all its financial records in one account book, without any regard to which corporation was developing the project at the time. It was Enterprises who hired CAS to advertise and sell the units, but the advertisements appeared in Development's name. It was Enterprises who offered to refund buyers' downpayments, but it was another corporation that actually paid them. Indeed, two of Enterprises' letters introduced into evidence by Snyder were typed under Development's letterhead.

Furthermore, it was Enterprises that contracted with Gartner to convey Unit C–21, but Enterprises never owned the land on which Hunter Highlands was developed. Snyder, Westerlind, and their wives acquired the land in August 1971, and kept it in their name until October 5, 1972, when they conveyed it to Hunter. Nonetheless, Enterprises represented in its brokerage agreement with CAS that it owned the land. In fact, between 1970 and 1972, Enterprises usually had only a few hundred dollars in its checking account. Sometimes funds were deposited just before, or just after, Enterprises used them. Enterprises had no account book, stock ledger, stock certificate book, by-laws, minutes of stockholders' meetings, or payroll. It had no office distinct from that of the other Snyder-controlled entities. Its funds were used on three occasions to pay for the care of horses that were not Enterprises' property. And as of September 30, 1972, it no longer owned its only two major assets—two parcels of land—which it conveyed to another corporation Snyder and Westerlind controlled, King James Extended Care, Inc. It did not receive any consideration for the conveyance.

Gartner began this action on March 5, 1975, against Snyder, Westerlind, and Enterprises. Judge Knapp entered a default judgment of $34,919 against all three defendants on May 20, 1975, but in an order of July 8, allowed the defendants to contest the complaint if they filed a bond for the full amount of the judgment. Only Snyder filed the bond and a trial was held in June 1977. Snyder conceded at trial that Enterprises breached its contract to convey Unit C–21 to Gartner on December 15, 1972. He argued, however, that Enterprises' breach was the result of its difficulties with the SEC and Department of Environmental Conservation, that at all times he believed the project could be finished, and that sharp increases in the costs of the water and sewage systems, as well as of labor and materials, necessitated raising the units' prices when the project was changed to a condominium basis. Gartner argues that Snyder initially offered the units at the lower price to "test the market" and raised the price after he found ample interest in the project, that he could have obtained the

permits in 1972 had he spent more money to do so, and that he stripped Enterprises of its major assets when he realized that Enterprises was going to breach its contract. Judgment Knapp filed his opinion thirteen months after the three-day trial ended.

■ Snyder claims that Judge Knapp erred in holding him personally liable for Enterprises' breach. We agree. New York law, which is the law we must apply in the diversity suit, allows individuals to incorporate for the very purpose of avoiding personal liability, *Bartle v. Home Owners Cooperative,* 309 N.Y. 103, 127 N.E.2d 832 (1955), but also allows courts to disregard the corporate form and impose personal liability—to "pierce the corporate veil," as one of the law's least limpid metaphors would have it—when necessary " 'to prevent fraud or to achieve equity.' " *Port Chester Elec. v. Atlas,* 40 N.Y.2d 652, 656, 389 N.Y.S.2d 327, 331, 357 N.E.2d 983, 986 (1976) (quoting *International Aircraft Trading Co. v. Manufacturers Trust Co.,* 297 N.Y. 285, 292, 77 N.E.2d 521 (1948)). Because New York courts disregard corporate form reluctantly, they do so only when the form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego. *Port Chester, supra; Walkovszky v. Carlton,* 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966). The court will also generally consider whether the corporation was adequately capitalized in determining whether to disregard the corporate form.

■ The district court held that Snyder had inadequately capitalized Enterprises, had disregarded its separate identity, had used it to a fraudulent end, and should therefore be personally liable for its breach. As badly as Snyder conducted the Hunter Highlands project, we cannot say that Gartner has shown by a preponderance of evidence either that Snyder engaged in a fraud to get more than the contract price for Unit C–21, or that he transacted purely personal business through Enterprises to the extent that the corporation became his alter ego.

Gartner's theory that Snyder initially "tested the market" intending to raise the price later—that is, that Snyder engaged in a "bait and switch"—is unpersuasive. The SEC problem, which was the cause of the decision to change to a condominium basis and to attempt to rescind all the contracts—in short, to start over again—arose after the project's sales campaign had begun. Enterprises initially responded, through Fromer, by disputing the SEC's theory and offering only to revise the advertisements. There is no evidence that Enterprises contemplated converting to condominiums until after meetings and correspondence with the SEC. Rather, Schiff's June 16 letter to the SEC suggests that the offers of rescission were dictated by an understanding made between Enterprises and the SEC during discussions that led to Enterprises' request for a no-action letter. Granted that Enterprises might more prudently have suspended sales sooner than it did, we do not see how its handling of the SEC problem supports Gartner's theory that Snyder tested the market and only converted the project to a condominium development, sought rescission and raised the prices after finding the market receptive.

Similarly, the problem of obtaining water and sewage permits, and the consequent increase in costs, arose well after Enterprises calculated $45,500 as the units' price. Enterprises proposed a sewage system that would have cost $50,000. Snyder's testimony that the substantial opposition raised against that proposal at the July hearing was wholly unexpected is not disputed. Granting again that Enterprises might more prudently have sought all necessary permits before pricing its units and beginning their sale, we do not find that Enterprises' difficulties obtaining permits evinces any fraud.

Nor do we find evidence of fraud in the fact that Snyder, Westerlind, and their wives, rather than Enterprises owned the land upon which Hunter Highlands was to

sit. There is no evidence that, absent the other difficulties which made it meaningless to do so, Snyder and Westerlind could not or would not have conveyed the land into Enterprises' name before December 15, 1972.[4] Moreover, it is apparently not uncommon for real estate developers to conduct business through several different corporations. *Cf. Port Chester, supra.*

The district court found as a further reason for disregarding Enterprises' corporate form the fact that Snyder himself failed to observe Enterprises' separate identity. To be sure, Snyder does not deny that Enterprises had no books, files, or office distinct from those of the other corporations he controlled, nor that the Hunter Highlands files did not distinguish among the different corporations involved in the project. But we do not think that the district court properly applied New York law to those facts. Snyder's disregard suggests that Enterprises was simply one arm of a larger corporate combine; it does not prove that Snyder used Enterprises, or the larger combine, to conduct his purely personal business. Thus, this case resembles *Walkovszky v. Carlton, supra,* where Carlton, the individual defendant, controlled ten corporations, each of which owned two taxicabs. After being struck by one of the cabs, the plaintiff attempted to sue Carlton, individually, alleging that none of the corporations had a separate identity. The New York Court of Appeals said, "[I]t is one thing to assert that a corporation is a fragment of a larger corporate combine which actually conducts the business . . . It is quite another to claim that the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends." 18 N.Y.2d at 418, 276 N.Y.S.2d at 588, 223 N.E.2d at 8.[5] Because the plaintiff had not alleged any particulars showing that Carlton was actually conducting personal business, such as "shuttling personal funds in and out of the corporations," *id.* at 420, 276 N.Y.S.2d at 590, 223 N.E.2d at 10, the court held that he had not stated a claim against Carlton personally. In our case, the only evidence suggesting that Snyder used Enterprises' funds for personal matters is Snyder's admission at trial that his father is a horse buff and that three checks were drawn on Enterprises' account within one week in mid-1971 to pay for the care of horses Enterprises did not own. Although that expense was personal, it was the only one Snyder paid for with Enterprises' funds, it was paid before the project began, and it was a petty amount in comparison to the sums involved in the project. It hardly amounted to a "shuttling [of] personal funds in and out" of Enterprises.

Similarly, the fact that Enterprises conveyed its two parcels of land to another Snyder-controlled corporation, while it suggests that Gartner may have claims against the larger Snyder-controlled corporate combine, does not show that Snyder used Enterprises to conduct purely personal business.[6] In *Port Chester Elec. v. Atlas, supra,* where the individual defendant Atlas controlled several corporations and rendered one judgment-proof by causing it to transfer all its assets to the others, the New York Court of Appeals said, "The fact that Sol Atlas was the controlling principal of these corporations is, by itself, insufficient to justify disregarding the corporate form. Since Atlas himself carefully respected the separate identities of the corporations, and each corporation was pursuing its separate corporate business, rather than the purely per-

---

4. It was not meaningless, however, for Snyder and Westerlind to convey the land to Hunter. Snyder's uncontroverted testimony was that the Port Jervis Savings and Loan Association, from which the project obtained its mortgage, required that the mortgagor be a "clean" corporation. Snyder and Westerlind therefore created Hunter, conveyed the land to it, and used it to continue the project.

5. *Cf. Luckenbach S.S. Co. v. Grace & Co.,* 267 F. 676 (4th Cir. 1920).

6. However troubling we find Snyder's effort to empty Enterprises of its remaining assets shortly before the breach, this effort is more easily seen as a response to the difficulties of the preceding summer than as a step in a long-standing fraudulent scheme.

sonal business of Atlas, we conclude that the corporate veils of the defendant corporations should not be 'pierced.' " 40 N.Y.2d at 657, 389 N.Y.S.2d at 331, 357 N.E.2d at 986–87. In our case, Snyder ignored the separate identities of the corporations he controlled, but did not use them to pursue personal business.

Thus, while it may be appropriate to disregard Enterprises' form and hold Snyder's larger corporate combine liable for Enterprises' breach—although we of course make no judgment on that question because the other Snyder-controlled corporations were not parties to this action—we do not find evidence in the record to justify holding Snyder personally liable for Enterprises' breach. Although Enterprises was thinly capitalized, that alone is not a sufficient ground for disregarding the corporate form. We know of no New York authority that disregards corporate form solely because of inadequate capitalization. The judgment against Snyder is therefore reversed. As neither Enterprises nor Westerlind appeal the default judgment against them, those judgments still stand and Gartner is free to pursue whatever remedies he may have against the other Snyder-controlled corporations. We are not here concerned with the nature of the remedies Gartner may have with respect to collecting judgment under New York law.

We reverse the judgment of liability as to Snyder.[7]

---

7. Snyder also argued that Judge Knapp erred in disregarding a contract clause that specified return of downpayment as Enterprises' sole liability for failing to convey title as promised, and in calculating Gartner's loss according to the value the property would have had if the contract had been fulfilled, rather than the value the property had at the time of the breach. Having decided that Snyder should not be personally liable for Enterprises' breach, we do not address those arguments, for Snyder is the only appellant before this court.