210 F.3d 96 (2nd Cir. 2000)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
FUNDS HELD IN THE NAME OR FOR THE BENEFIT OF JOHN HUGH WETTERER, and/or ASOCIACION AMIGOS DEL LOS NINOS HOGAR MI CASA, a.k.a. MI CASA, at BANK INTERNATIONAL, LLOYDS BANK INTERNATIONAL and STERLING BANK, including but not limited to BANK OF AMERICA, ACCOUNT NUMBERS IF 1119-9984, 162232 IBF, 10201-01-1 AND B-58-05616, LLOYDS BANK INTERNATIONAL BANK NUMBER 00070891 (NASSAU BRANCH) and STERLING BANK ACCOUNT NUMBERS 907-103 AND CD 15590 and all related accounts and funds, Defendants-Appellants.
 Docket No. 98-6273
No. 98-6273--August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: August 30, 1999
Decided: April 14, 2000
 
 Claimant appeals from an amended judgment entered in the Eastern District of New York (Spatt, J.), forfeiting to the use and benefit of plaintiff-appellee United States certain funds on deposit in the Bank of America and Sterling Bank.
 Reversed and remanded.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 JUNE RESNICK GERMAN, Huntington, N.Y., for Defendants-Appellants.
 Susan L. Riley, Assistant United States Attorney, Eastern District of New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Arthur P. Hui, DEBORAH B. ZWANY, Assistant United States Attorneys, on the brief), for Plaintiff-Appellee.
 Before: NEWMAN, CARDAMONE, JACOBS, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 Claimant in this case is the Asociacion Amigos De Los Ninos Hogar Mi Casa (the "Asociacion"), a not-for-profit corporation organized under the laws of Guatemala which cares for orphaned and abandoned children in that country. The Asociacion's former president, John Wetterer, was indicted in the Eastern District of New York for mail fraud, on the theory that he engaged in a pattern of sexual and physical abuse of boys entrusted to his care by the Asociacion, and that the Asociacion's fund-raising campaign concealed that material fact from donors. The United States District Court for the Eastern District of New York (Spatt, J.) ordered forfeiture of three bank accounts (one in Florida, two in Texas) held in the names of the Asociacion and Wetterer, after finding that the funds on deposit represented the proceeds of mail (and wire) fraud and were used in money laundering transactions. On appeal, claimant contends, inter alia, that the district erred by (i) finding jurisdiction in the Eastern District over the seized bank accounts, (ii) finding that the Asociacion was an alter ego of John Wetterer, and (iii) precluding the Asociacion from availing itself of the innocent owner defense as provided in 18 U.S.C. 981(a)(2) of the federal civil forfeiture statute.
 
 In this opinion we hold that:
 
 2
 (1) as to account number 05616 at the Bank of America in Florida, the district court lacks forfeiture jurisdiction; and(2) as to the two Sterling Bank accounts in Texas, claimant has (a) carried its burden of establishing that it is not an alter ego of Wetterer, and (b) carried its burden of establishing that it is the innocent owner of those funds.
 
 
 3
 Accordingly, the judgment of the district court is reversed and remanded with instructions for the district court to (A) enter an order promptly releasing all of the seized funds to the claimant, and (B) retain jurisdiction to consider and decide whether the claimant is entitled to an award of pre-judgment interest on those funds.
 
 
 4
 Claimant additionally raises (and this record presents) several other issues, including (1) whether the government can demonstrate on this record probable cause that Wetterer engaged in money laundering--the predicate offense to forfeiture--with the funds held in the Miami account at the time of seizure; (2) whether the "lowest intermediate balance" analysis employed by this Court for tracing tainted funds in the context of drug proceed forfeitures, see United States v. Banco Cafetero Panama, 797 F.2d 1154, 1159-61 (2d Cir. 1986), applies in a civil forfeiture action where the provision of the civil forfeiture statute allowing for substitute forfeiture of assets, 18 U.S.C. 984, is inapplicable; and (3) if the lowest intermediate balance analysis does apply in this case, whether the district court erred in allowing for forfeiture of commingled accounts in their entirety. Since we dispose of this case chiefly on the ground that the Asociacion is not the alter ego of Wetterer, this opinion will not address the merits of these and other plausible issues.
 
 BACKGROUND
 
 5
 The facts underlying this appeal have been set forth at length in the opinions of the district court, see United States v. Funds Held in Name or for Benefit of Wetterer; 899 F. Supp. 1013 (E.D.N.Y. 1995) ("Wetterer I"); United States v. Funds Held in Name or for Benefit of Wetterer, 991 F. Supp. 112 (E.D.N.Y. 1998) ("Wetterer II"); United States v. Funds Held in Name or for Benefit of Wetterer, 17 F. Supp. 2d 161 (E.D.N.Y. 1998) ("Wetterer III"), and we assume familiarity with them. We recount only such facts as bear upon our resolution of the issues presented on appeal.
 
 A. Basis of This Forfeiture Action
 
 6
 In 1976, John Hugh Wetterer ("Wetterer"), a former New York resident, founded an orphanage in Guatemala City called Mi Casa. Mi Casa is now one of six facilities run by the Asociacion, a not-for-profit corporation that was incorporated under the laws of Guatemala in 1984 to promote the welfare of orphaned or abandoned children in Guatemala by providing food, shelter education and other support services. At the time the incidents underlying this action took place, the Asociacion's board of directors included Wetterer, who served until 1991 as president of the board, and three prominent members of Guatemala's business and political community.
 
 
 7
 This forfeiture action stems from a series of newsletters about Mi Casa that Wetterer sent to his sponsors and donors in the United States and abroad. These newsletters, which sometimes solicited sponsor donations, depicted Mi Casa as a well run orphanage where abandoned and neglected boys were offered a chance for a better life through shelter, medical care, clothing and education.
 
 
 8
 This wholesome image of Mi Casa was impaired in early 1989. The television news-magazine "60 Minutes" received information that Wetterer was sexually abusing boys at Mi Casa. After looking into these claims, "60 Minutes" disclosed what it described as a chronic and extensive pattern of sexual abuse by Wetterer at Mi Casa, and aired a segment in which Wetterer was confronted with the allegations and vehemently denied them.
 
 
 9
 Also in 1989, the United States Postal Service began its own investigation, and concluded that Wetterer had been abusing boys at Mi Casa and that his monthly newsletters to sponsors and donors in the United States contained false representations that Mi Casa provided a healthy and stable environment for children. On September 14, 1990, the United States filed a criminal complaint against Wetterer in the Eastern District of New York, and a warrant was issued for his arrest in that jurisdiction. A first indictment charged violation of the mail fraud statute, 18 U.S.C. 1341, based on Wetterer's allegedly fraudulent representations in the monthly newsletters. A second indictment charged theft and conversion of funds, based on certain funds transfers that Wetterer had made to his brother. Wetterer was notified of the arrest warrant but has not appeared to answer the charges. He remains in Guatemala, a country from which he cannot be extradited, and the United States characterizes him as a fugitive.
 
 
 10
 This forfeiture action was commenced in the Eastern District of New York on January 22, 1991, when the government moved, pursuant to 18 U.S.C. 981, to forfeit certain bank accounts held in the name of the Asociacion or Wetterer. The in rem complaint specified mail fraud as the crime underlying the seizure, alleged that Wetterer financed the operation of Mi Casa through contributions solicited in the United States, and concluded that "these solicitations are false and fraudulent insofar as Wetterer represents that Mi Casa provides a healthy and stable environment for its residents, when, in fact, he molests and sexually abuses the boys who reside there."
 
 
 11
 An arrest warrant in rem authorizing the seizure of named bank accounts was issued the same day, and the government promptly seized the funds on deposit in the following three accounts: (1) Bank of America (Florida) account 05616 held in the name of the Asociacion (the "Miami account"), containing $39,436; (2) Sterling Bank (Texas) account 907-103 held in the name of the Asociacion, containing $27,578.31 (the "Texas checking account"); and (3) Sterling Bank (Texas) account CD 15590 held in the name of Wetterer (the "Texas CD account"), containing $42,312.52 ((2) and (3) together, the "Texas accounts").
 
 B. Details of the Seized Accounts
 1. The Miami Account
 
 12
 In the period 1976 through 1988, the financing of Mi Casa's operations was assisted by the American Friends of Children ("AFC"), an organization that Wetterer and several partners founded in Massapequa, N.Y., to raise money and serve the needs of orphaned children. AFC's treasurer, Daniel Mackey, testified that during this time AFC sent Wetterer over $1 million in donations for Mi Casa. Mackey received these donations by mail at a post office box in Massapequa, in the Eastern District of New York. The donations passing through this postal box are the only funds that the government has shown to be "tainted," i.e., they are the only funds shown to have been generated in response to the allegedly fraudulent newsletters, and they are accordingly the only funds referred to as "tainted funds" in this opinion.
 
 
 13
 After receiving these donations, Mackey would deposit them in a Manhattan branch of Chase Manhattan Bank and draw checks payable to "John Wetterer," which were then forwarded to the Bank of America in Miami and deposited in the Miami account. Seventy-eight checks, totaling $585,785.23, were deposited in this way. The Miami account was maintained in the name of Mi Casa, but Wetterer was its sole signatory and was ultimately responsible for transferring funds from the Miami account to Mi Casa in Guatemala.
 
 
 14
 The original premise of the government's forfeiture action was that all of the funds deposited in the Miami account, including the entire $39,436 balance seized by the United States, had traveled to Massapequa and were therefore tainted. But the evidence at the subsequent forfeiture trial, see infra at, disclosed: that on November 8, 1988, in response to the abuse allegations, Mackey had stopped sending checks; that by June 21, 1989, the Miami account had been drawn down to $680.68; that all subsequent deposits into the Miami account came from a Paris charity called Les Amis des Enfants ("Les Amis"); and that all of the funds from Les Amis were transmitted by wire and never passed through the U.S. mails. At the time the Miami account was seized, all of the $39,436 account funds was attributable to Les Amis. See Unpublished Memorandum Decision and Order ("Wetterer IV") (amending complaint).
 
 2. The Texas Accounts
 
 15
 The amounts on deposit in the two Sterling Bank accounts in Texas fluctuated over the relevant period. The Texas checking account balance ranged from $122,397.22 to $16,884.25; the Texas CD account balance ranged from $42,312.52 to $30,000. On the date of seizure, the two accounts totaled $69,622.
 
 
 16
 According to the government, these accounts are tainted because some of the funds seized from them are traceable to funds generated by AFC in response to Wetterer's newsletters. The clearest instance is $60,000 of tainted AFC donations that were transferred directly from the Miami account to the Texas checking account. Other transfers from the Miami account, however, are not necessarily tainted as they originated from a Schwab brokerage account which has not been linked to the alleged mail fraud.
 
 
 17
 Specifically, the record traces a $172,885.22 transfer from the Schwab account, through the Miami account, and into the Texas checking account (in the amount of $100,000 and the Texas CD account (in the amount of $30,000). The Schwab account was held in the name of AFC but it was separate and distinct from the Miami account at Bank of America, and the government has not attempted to show when (or how) funds arrived at Schwab, whether they were solicited by fraud, or whether they traveled by mail or wire. Nevertheless, as will be discussed below in some detail, the government seeks forfeiture of the Schwab funds that came to rest in the Texas accounts because they passed (briefly) through the Miami account where they mixed with $6,796.14 of tainted AFC donations. See infra at 23-34.
 
 C. Prior Proceedings
 
 18
 One month after seizure of the three accounts, the Asociacion filed a claim alleging that because the accounts were intended for the use and benefit of the Asociacion and the children of Mi Casa, the Asociacion was the "innocent owner" of the funds whether or not Wetterer had perpetrated a fraud through his newsletters. The district court rejected this claim. Adopting the findings of Magistrate Judge A. Simon Chrein, the court found the Asociacion to be an alter ego of Wetterer--a fugitive from justice--and therefore itself barred under the fugitive disentitlement doctrine from contesting seizures of property. See Wetterer I, 899 F. Supp. at 1031-32.
 
 
 19
 Shortly after this decision, the Supreme Court in Degen v. United States, 517 U.S. 820 (1996), expressly disapproved of certain applications of the fugitive disentitlement doctrine. In light of Degen, the district court reinstated the Associacion's claim to the seized funds. A bench trial on the merits of the forfeiture action began on February 19, 1997, and concluded almost one year later on February 6, 1998. See Wetterer III, 17 F. Supp. 2d at 164. The court adhered to its earlier finding that the Asociacion was an alter ego of Wetterer, and held that the Asociacion therefore could not assert the innocent owner defense. See id. at 165. The court made the following, additional findings:
 
 
 20
 1. Wetterer sexually abused a number of boys at Mi Casa;
 
 
 21
 2. Wetterer inflicted physical abuse by paddling boys at Mi Casa;3. The newsletters falsely represented Mi Casa as a safe haven for boys;
 
 
 22
 4. The newsletters intentionally failed to advise potential contributors of Wetterer's misconduct and that such concealment constituted fraud;
 
 
 23
 5. That after he was accused of sexual abuse, Wetterer expressly denied the allegations in the newsletters of December 1988, March 1989, May 1989, and September 1990;
 
 
 24
 6. That substantial donations made in response to the newsletters were mailed to the organization that collected money for Mi Casa and were ultimately deposited in accounts controlled by Wetterer;
 
 
 25
 7. That if the contributors knew of Wetterer's sexual and physical abuse of the boys, they would not have made the contributions;
 
 
 26
 8. That Wetterer engaged in financial transactions with the Miami account and the Texas accounts involving the proceeds of the mail fraud;
 
 
 27
 9. That Wetterer knew that these financial transactions involved funds that were the proceeds of mail fraud; and
 
 
 28
 10. That Wetterer engaged in these financial transactions to promote the mail fraud.
 
 
 29
 See id. at 187-88.
 
 
 30
 Missing from Wetterer III is any finding that Wetterer committed wire fraud by accepting the wired deposits of Les Amis. During trial, the court had rejected a government motion to add an allegation of wire fraud to the mail fraud allegations in the original in rem complaint, finding that there was "insufficient proof of wire fraud" in the record and holding that any such amendment would be "futile." See id. at 185. Mail fraud, however, could not support jurisdiction over the funds in the Miami account because at the time of the seizure no funds on deposit had ever passed through U.S. mails. See Wetterer IV. After trial, the district court reconsidered and granted the government's motions pursuant to Fed. R. Civ. P. 52(b) to amend the court's findings and conclusions of law and to add a wire fraud claim to the complaint. Wetterer, however, has never been indicted on this charge.
 
 
 31
 Of the many issues raised on appeal we address: (1) whether the district court in the Eastern District had a basis for asserting jurisdiction over the seized accounts; (2) whether the district court clearly erred in finding that the Asociacion was an alter ego of John Wetterer; and (3) whether the Asociacion, on behalf of the children of Mi Casa, can avail itself of the innocent owner defense pursuant to 18 U.S.C. 981(a)(2).
 
 DISCUSSION
 
 32
 This action was brought pursuant to 18 U.S.C. 981, which provides in pertinent part for the civil forfeiture of:
 
 
 33
 Any property, real or personal, involved in a transaction or attempted transaction in violation of section ... 1956 or 1957 of this title, or any property traceable to such property.
 
 
 34
 18 U.S.C. 981(a)(1)(A). To seize property under this section, the government must demonstrate probable cause to believe that the property is subject to forfeiture, see In re the Seizure of All Funds In Accounts In the Names Registry Publ'g, Inc., 68 F.3d 577, 580 (2d Cir. 1994). In this case, probable cause requires a showing that the seized funds were "involved in a transaction or attempted transaction in violation of" the money laundering statutes, Section 1956 and 1957. See 18 U.S.C. 981(a)(1)(A). Section 1956 prohibits:
 
 
 35
 A financial transaction which in fact involves the proceeds of specified unlawful activity [including violations of the mail and or wire fraud statutes, 18 U.S.C. 1341, 1343] . . . with the intent to promote the carrying on of specified unlawful activity.
 
 
 36
 . . .
 
 
 37
 18 U.S.C. 1956(a)(1). Section 1957 prohibits:
 
 
 38
 a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity [including violations of the mail and or wire fraud statutes]. . . .
 
 
 39
 18 U.S.C. 1957(a).
 
 
 40
 In this Circuit, the government's burden is "to show a nexus between the illegal conduct and the seized property." Marine Midland Bank, N.A. v. United States, 11 F.3d 1119, 1126 (2d Cir. 1993). Once the government establishes that there is probable cause to believe that a nexus exists between the seized property and the predicate illegal activity, the burden shifts to the claimant to show by a preponderance of the evidence (1) that the defendant property was not in fact used unlawfully, or (2) that the predicate illegal activity was "committed without the knowledge" of the owner-claimant, 18 U.S.C. 981(a)(2), that is, that the claimant is an "innocent owner." See United States v. 755 Forest Road, 985 F.2d 70, 72 (2d Cir. 1993) ("The so-called 'innocent owner' defense is an affirmative defense to be proven by the owner-claimant."); see also Marine Midland, 11 F.3d at 1126 (discussing statutory framework).
 
 
 41
 We consider each of the seized accounts separately.
 
 A. The Miami Account
 
 42
 The funds seized from the Miami account must be released to the claimant because these funds were wired from Paris to Miami in response to newsletters sent from Guatemala to France, Wetterer had not been indicted for wire fraud in the Eastern District of New York, and there is therefore no basis for forfeiture jurisdiction in that district.
 
 
 43
 Section 1355(b)(1)(B) of Title 28, U.S. Code, provides for forfeiture jurisdiction in any "district where venue for the forfeiture action . . . is specifically provided for in section 1395 of this title or any other statute." 28 U.S.C. 1355(b)(1)(B) (emphasis added). Section 1395, which lays jurisdiction in any venue where the seized property was "brought" or "found," 28 U.S.C. 1395(b),(c), does not establish Eastern District jurisdiction over the funds found in the Miami account, because they were wired there direct from Paris. The government is therefore compelled to cite some "other statute" to establish jurisdiction, and relies here solely on 18 U.S.C. 981(h), the venue provision of the federal forfeiture statute.
 
 In relevant part, Section 981(h) provides:
 
 44
 [I]n the case of property of a defendant charged with a violation that is the basis for a forfeiture of the property under this section, a proceeding for forfeiture under this section may be brought in the judicial district in which . . . the criminal prosecution is brought.
 
 
 45
 Id. (emphasis added).
 
 
 46
 It is unclear how this provision furnishes jurisdiction over the Miami account in the Eastern District. It is undisputed (A) that the only specified "basis for a forfeiture" of the funds held in the Miami account is Wetterer's alleged violation of the federal wire fraud statute, 18 U.S.C. 1343; and (B) that the only specified basis for the Eastern District indictment is violation of the federal mail fraud statute, 18 U.S.C. 1341. Although the district court amended its initial findings to find probable cause that Wetterer violated the wire fraud provision, that finding is irrelevant for jurisdictional purposes because there is no wire fraud count in the Eastern District indictments. It therefore cannot be said that Wetterer has been "charged with a violation that is the basis for forfeiture" of the funds held in the Miami account. 18 U.S.C. 981(h).
 
 
 47
 The government suggests that this forfeiture action together with the indictments form a single ball of wax because every penny seized from the Miami account was raised in response to the same fraudulent statements. We disagree. The mail fraud charge in the Eastern District is that money was mailed from France and elsewhere to Massapequa in response to letters mailed from Guatemala. The wire fraud forfeiture claim is that money was wired from France to Miami in response to letters mailed from Guatemala to France. These are distinct offenses; no matter how one views the record, Wetterer has never been indicted on a wire fraud charge. On these facts, a plain reading of 18 U.S.C. 981(h) confirms that there is no jurisdictional hook in the Eastern District over the funds wired from Les Amis in Paris to the Bank of America in Miami. Since the district court found that all of the Miami funds at the time of seizure can be traced to such wire transfers, see Wetterer IV (noting that without wire fraud "the judgment must be amended to exclude the Bank of America account number 05616"), we hold that there is no jurisdictional basis for this forfeiture proceeding as it relates to the Miami account.
 
 
 48
 Our holding on this ground is necessarily a narrow one. The venue provision of 981(h) does not reach the Miami account solely because, in this unusual case, it is a simple matter to demonstrate that the seized property was not generated by the crime charged in the indictment: the indictment charges mail fraud only and the district court has found that the only basis for a forfeiture of the Miami account is wire fraud. Given the fungibility of funds in most financial transactions and money laundering schemes, so simple an analysis may not be available often.
 
 
 49
 Our jurisdictional holding does not in itself preclude the government from seeking a new indictment of Wetterer--on a wire fraud charge--in order to find a jurisdictional basis for reinstituting proceedings for the forfeiture of the Miami account, just as the government sought and won an amendment adding wire fraud allegations to the in rem complaint. However, this forfeiture action has been pending for nine years, during which time charitable donations have been withheld from the charitable uses intended by the donors. Therefore, while we reach the jurisdictional question first and on that ground direct the district court to enter an order promptly releasing the Miami account to the Asociacion, we note for the purposes of any further proceedings in this case that our holding on grounds of alter ego (discussed below) defeats all of the government's claims in this case and should not be read as limited to any particular account.
 
 B. The Texas Accounts
 
 50
 As to the Texas Accounts, the Asociacion alleges that it is an innocent owner that enjoys the protection of 18 U.S.C. 981(a)(2) ("No property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder."). Once probable cause supporting a civil forfeiture is established, the burden shifts to the claimant to establish that it is an innocent owner of the seized property. See United States v. All Assets of G.P.S. Automotive Corp., 66 F.3d 483, 487-88 (2d Cir. 1995). To do so, the claimant must demonstrate by a preponderance of the evidence that it did not consent to or know of the illegal activities, and was not willfully blind to them. See id.; United States v. One Parcel of Property, 985 F.2d 70, 72 (2d Cir. 1993).
 
 
 51
 We presume arguendo that the government has met its initial burden of establishing "probable cause" for seizure of the amounts subject to forfeiture from the Texas accounts. The district court rejected the claimant's innocent owner defense on the grounds that the claimant was an alter ego of Wetterer and therefore could not disclaim knowledge of his illegal activities. See Wetterer III, 17 F. Supp. 2d at 165, 188. Our own review of the record convinces us:
 
 
 52
 (1) that the factual findings of the district court were clearly erroneous on this ground, and
 
 
 53
 (2) that under the relevant corporate law standards, the Asociacion has carried its burden of proving by a preponderance of the evidence (a) that it is not an alter ego of Wetterer and (b) that it is an innocent owner of the seized funds pursuant to 18 U.S.C. 981(a)(2).
 
 
 54
 Before considering the district court's alter ego finding and the merits of the Asociacion's innocent owner defense, we turn to the choice of law that governs these questions.
 
 1. Choice of Law
 
 55
 A district court's choice of law determination concerns a matter of law, and therefore we review it de novo. See Sheldon v. PHH Corp., 135 F.2d 848, 852 (2d Cir. 1998). The district perceived a false conflict between Texas and New York law, and applied New York law to all of the relevant questions pertaining to alter ego. See Wetterer I, 899 F. Supp. at 1024-28. We agree that New York provides the appropriate legal framework for deciding the alter ego question. This framework is set forth in the district court's opinion. See id. at 1020, 1027 (discussing Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 137-39 (2d Cir. 1991).
 
 
 56
 The district court erred, however, in failing to consider the not-for-profit corporation law of Guatemala in deciding the embedded question of whether the Asociacion maintained the requisite corporate formalities. See id. at 1028; cf. Passalacqua, 933 F.2d at 138 (applying New York law and listing "lack of corporate formalities" as a factor bearing on alter ego). Questions relating to the internal affairs of corporations--for profit or not-for-profit--are generally decided in accordance with the law of the place of incorporation, see First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983); Scottish Air International, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1234 (2d Cir. 1996); Zion v. Kurtz, 50 N.Y.2d 92, 100, 428 N.Y.S.2d 199, 203 (1980), and we see no reason to deviate from that principle here.
 
 
 57
 Consequently, in deciding whether the Asociacion observed corporate formalities and maintained its corporate existence separate from Wetterer, we look to the law and corporate practices of Guatemala.
 
 2. Alter Ego
 
 58
 The district court's legal conclusion that the Asociacion was Wetterer's alter ego is reviewed de novo, see Freeman v. Complex Computing Co., 119 F.3d 1044, 1051 (2d Cir. 1997) (citing Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1029 (2d Cir. 1995)), but we defer to factual findings unless they are clearly erroneous, see All Assets of G.P.S., 66 F.3d at 488.
 
 
 59
 The district court found that the Asociacion lacked control over Wetterer and functioned as his alter ego because:
 
 
 60
 the Asociacion failed to maintain corporate records, minutes and other formalities with respect to its financial transactions involving Wetterer . . . ; Asociacion funds were put in and taken out by Wetterer for personal rather than corporate purposes . . . ; and that with respect to the Asociacion bank accounts at issue, Wetterer used the accounts as if they were his own. . . .
 
 
 61
 Wetterer I, 899 F. Supp at 1031; see also Wetterer III, 17 F. Supp. 2d at 165.
 
 
 62
 Courts must be extremely reluctant to disregard corporate form, see William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600 (2d Cir. 1989), and should do so only when the corporation primarily transacts the business of the dominating interest rather than its own, see id.; see also Passalacqua, 933 F.2d at 138 (alter ego liability requires "complete control by the dominating [party] that leads to a wrong against third parties") (emphasis added). The "alter ego question depends upon the totality of the facts." United States v. Jon-T Chems., Inc., 768 F.2d 686, 692 (2d Cir. 1985).
 
 
 63
 On key indicia, the record here establishes the independence of the Asociacion Board: it (1) consisted of prominent members of Guatemalan society, including a former foreign minister; (2) had the power to oust Wetterer if they credited the charges against him; (3) held annual meetings and reviewed quarterly reports; (4) held monthly meetings to review donation records; (5) had the ability to deny Wetterer's expenditures and other proposals, and often did; (6) oversaw millions of dollars in financial transactions from 1984 until the present; (7) convened immediately after the "60 Minutes" interviews, and requested a formal investigation by organs of the Guatemalan government; (8) relied on the results of seven separate government investigations conducted by seven separate agencies in Guatemala, all of which cleared Wetterer of abuse charges[1]; (9) continued to function (during these investigations) after Wetterer was replaced as the Asociacion's legal representative and President; and (10)--not least--oversaw the operation of six separate facilities with over 700 boys and girls, employed over 35 teachers and supported a staff of more than 70 volunteers.
 
 
 64
 Against this backdrop, the government has adduced three isolated transactions--unearthed after an 11-month investigation--to support the theory that the Board lacked any power over Wetterer. The only alter ego ruling we can find that relied on remotely parallel facts was reversed in Gartner v. Snyder, 607 F.2d 582 (2d Cir. 1979). In Gartner, the defendant had, inter alia, withdrawn funds from a corporate account to pay for the care of horses, apparently to gratify the equine interests of defendant's father. See id. at 585, 587. Judge Lumbard noted:
 
 
 65
 Although that expense was personal, it was the only one Snyder paid for with [corporate] funds . . . and it was a petty amount in comparison to the sums involved in the [corporate] project. It hardly amounted to a 'shuttling [of] personal funds in and out' of [corporate accounts].
 
 
 66
 See id. at 587 (quoting Walkovszky v. Carlton, 18 N.Y.2d 414, 420, 276 N.Y.S.2d 585, 590 (1966)). On those facts, we found that the defendant had not "transacted purely personal business through [the corporation] to the extent that the corporation became his alter ego." See id. at 586 (emphasis added); see also Canario v. Lidelco, Inc., 782 F. Supp. 749, 760 (E.D.N.Y. 1992) (finding that a director purchasing a private airplane with corporate funds, taking personal income tax deductions for the airplane's depreciation while the corporation paid for its upkeep, and keeping all profits upon the airplane's sale "does not . . . rise to the level necessary to pierce the corporate veil").
 
 
 67
 The same conclusion is warranted here. The three transactions (the only transactions cited by the government) were small relative to the income, expenditures and operations of the Asociacion; they were not detrimental to the Asociacion (and were arguably beneficial); and each could be justified by a legitimate business purpose.
 
 
 68
 We consider each of the three transactions in turn.
 
 
 69
 (i) $60,000 Transfer to Wetterer's Brother. On February 2, 1987, $60,000 was transferred from an account held in the name of the Asociacion to John Wetterer's brother. It is conceded that these funds were used by his brother to purchase and improve New York waterfront property. But the issue for alter ego purposes is "personal benefit," and the government did not refute the testimony of Asociacion Board members that the funds thus removed from the corporate account were replaced simultaneously by certificates of deposit (previously owned by Wetterer) which one Board member (Mr. Sapper) maintained in his personal safe deposit box. Mr. Sapper also testified that the transfer yielded $18,000 in interest, a benefit to the Asociacion. Consequently, although the structure of this transaction was (as the district court concludes) "irregular," the loan (viewed in context) did not confer the sort of personal benefit on Wetterer (the sine qua non of alter ego) that contributes evidence to a finding of lack of separate identity.
 
 
 70
 (ii) $30,000 CD Account. In May 1989, the sum of $30,000 was transferred from the Asociacion's account to the Texas CD account at Sterling Bank (one of the two "Texas accounts") held in Wetterer's name. The Asociacion produced evidence that this transfer of funds was made with Board approval in order to assure that the Asociacion's funds would be insured by the Federal Deposit Insurance Corporation. Although the government responded by producing bank statements for Sterling bank accounts that exceeded FDIC limits on insured accounts, the claimant's rebuttal was that the excess represented accrued interest rather than deposits of principal made in disregard of FDIC limits. Even if the claimant's explanation is rejected, (i) the account was at all times held in trust for the Asociacion, (ii) Wetterer assigned all of his rights in the account to the Asociacion, and (iii) there is no evidence that Wetterer had a personal interest in these funds, or ever intended them to be used for any purpose other than running Mi Casa. The district court's findings that this transfer "strongly suggests" that corporate funds were personally used by Wetterer is clearly erroneous.
 
 
 71
 (iii) Payments to Jeffery Waller, Esq. Two payments (one in the sum of $10,000 and one in the sum of $15,000) were made from Asociacion accounts to New York lawyer Jeffrey Waller, to investigate the feasibility of a lawsuit against CBS and to represent Wetterer in connection with his indictment and the arrest warrant in the Eastern District. In light of the following circumstances, the Asociacion's legal expenditures in connection with the charges against Wetterer were justifiable in terms of the Asociacion's legitimate interests. The allegations were potentially ruinous for fund raising; seven official investigations had all exonerated Wetterer; the corporation had a legitimate and potentially vital interest in the reputation of a key Board member and fund-raiser; and Wetterer never received a salary from the Asociacion, or any form of compensation other than food and shelter, and therefore presumptively lacked means to defend himself. The use of Asociacion funds to defend the interests of an individual Board member--and the corporation itself--does not support an inference on this unusual record that Wetterer and the Asociacion are a single legal entity.
 
 
 72
 * * *
 
 
 73
 Even if one or more of these questioned transactions were "purely personal" in character, they still would not suffice to establish that the Asociacion exists primarily to advance Wetterer's business rather than its own. The amounts involved represent a small fraction of the Asociacion's business since its incorporation in 1984, and (at worst) they represent a misappropriation of the Asociacion's funds rather than an identity between its director and the corporation.
 
 
 74
 Moreover, under Guatemalan law the fact that the Asociacion did not adhere to corporate formalities for some of the transactions has no bearing on the alter ego question. The record contains a statement on Guatemalan law and expert testimony that illuminate the corporate formalities required by Guatemalan law for not-for-profit corporations. The applicable provisions of the Guatemalan Civil Code contain no requirement that the Board keep minutes, or to have a secretary in charge of such minutes; although association minutes ("libro de actas") are commonly used, they are not required. Therefore, the fact that certain payments do not appear in corporate minutes kept by the Asociacion is insignificant under Guatemalan law pertaining to not-for-profit corporations. The affairs of Mi Casa may have been conducted informally in some respects, but it was operated with the knowledge and consent of the Board, and in furtherance of the express purposes for which the Asociacion was formed. The lack of certain formalities, therefore, does not bear on the issue of alter ego in this case.
 
 
 75
 Nor do the policies behind corporate independence favor a finding of alter ego. See Wetterer I, 899 F. Supp. at 1032; Passalacqua, 933 F.2d at 139 ("The particular objectives and policies of the area under consideration should control.") (quoting Blumberg, The Law of Corporate Groups: Tort, Contract, and Other Common Law Problems in the Substantive Law of Parent and Subsidiary Corporations 6.01, at 108 (1987)). Trial testimony established (1) virtually all Guatemalan corporations keep U.S. bank accounts by reason of the insecurity of the Guatemalan economy; (2) that (under Guatemalan law) only a duly appointed legal representative of a not-for-profit corporation can deal for the corporation outside Guatemala; and (3) that at the time of the disputed transactions Wetterer was the Asociacion's only legal representative (a role now filled by Mr. Sapper). Since Wetterer was the only Board member with legal capacity to transact corporate business within the U.S., his conduct of such business does not support the conclusion that he "used [U.S.] accounts as if they were his own." Wetterer I, 899 F. Supp. at 1032.
 
 
 76
 In sum, (1) under New York law, courts must be extremely reluctant to pierce the corporate veil, (2) the record does not establish that Wetterer used corporate funds for personal ends, (3) in the context of the Asociacion's extensive corporate activities, the three questioned transactions do not render the corporate form a fiction, and (4) the policy considerations do not militate in favor of finding that the Asociacion is Wetterer's alter ego. Therefore, we are left with a firm conviction that a mistake has been made on the alter ego finding, and we reject the finding of the district court as clearly erroneous.
 
 3. Innocent Owners
 
 77
 Alter ego is the sole ground on which the district court determined that the Asociacion was not an innocent owner and it has never been shown--even assuming that Wetterer abused children at Mi Casa--that the Asociacion or its Board knew of or tolerated any abuse. As soon as the Board heard of the allegations, they requested that organs of the Guatemalan government undertake investigations; they credited the findings of seven such investigations by seven separate agencies; and they saw to it (as a precaution) that other adults reside at Mi Casa at all times.
 
 
 78
 On this record it is a short leap from our conclusion that the Asociacion carried its burden of establishing legal separateness to the conclusion that the abuse and mail fraud on the part of Wetterer was "committed without the knowledge" of the Asociacion pursuant to the innocent owner provision of the civil forfeiture statute. See 18 U.S.C. 981(a)(2). Nor is there any serious dispute concerning the Associacion's ownership of the funds in the Miami and Texas accounts. Congress has indicated, in the context of forfeiture, that "[t]he term 'owner' should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized," United States v. Parcel of Real Property known as 6109 Grubb Road, 886 F.2d 618, 625 n.4 (3d Cir. 1989) (quoting Joint Explanatory Statement of Titles II and III of Psychotropic Substances Act of 1978, 124 Cong. Rec. S17467 (1978) reprinted in 1978 U.S.C.C.A.N. 9518-22) (emphasis added). This understanding of the innocent owner defense, as applied to the drug forfeiture statute, applies as well to Section 981. See United States v. U.S. Currency, $81,000, 189 F.3d 28, 34 (1st Cir. 1999). Here, the only account for which the Asociacion lacks legal title is the Texas CD Account, but the Asociacion is still the "owner" of that account for purposes of 981(a)(2) since (i) the funds held therein were contributed in response to fund-raising solicitations for the express benefit of Mi Casa, (ii) the account was at all times held in trust for the Asociacion, and (iii) it is uncontested that beneficial owners (such as the Asociacion here) may claim protection under the innocent ownership provisions. See e.g., United States v. Santoro, 866 F.2d 1538, 1545 (4th Cir. 1989) (holding that the beneficial owner of an express trust has standing to contest a forfeiture action under 21 U.S.C. 881); United States v. 105,800 Shares of Common Stock of Firstrock Bancorp., 830 F. Supp. 1101, 1119 (N.D. Ill. 1993) (holding that a beneficial holder of an interest in a resulting trust is an innocent owner under section 981).
 
 
 79
 Thus, for substantially the reasons stated in our discussion of alter ego, the Asociacion is the lawful innocent owner of the funds seized in this case--pursuant to 18 U.S.C. 981 (a)(2)--and is entitled to the immediate release of those funds for the full use and benefit of the children of Mi Casa.
 
 
 80
 * * *
 
 
 81
 We have previously observed the government's "virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes." United States v. All Assets of Statewide Auto Parts, 971 F.2d 896, 905 (2d Cir. 1992). Another source of potential abuse is that forfeited funds are kept by the Department of Justice as a supplement to its budget. See 18 U.S.C. 981(e); 28 U.S.C. 524(c). Thus the agency that conceives the jurisdiction and ground for seizures, and executes them, also absorbs their proceeds. This arrangement creates incentives that evidently require a more-than-human judgment and restraint. The Supreme Court has politely remarked on the Department of Justice's "direct pecuniary interest" in maximizing drug forfeitures to meet the Deptartment's budget target. See United States v. James Daniel Good Real Property, 114 S.Ct. 492, 502 n.2 (1993) (quoting 1990 memo of the Attorney General: "We must significantly increase production to reach our budget target. . . . Failure to achieve the $470 million projection would expose the Department's forfeiture program to criticism and undermine confidence in our budget projections. Every effort must be made to increase forfeiture income during the remaining three months of [fiscal year] 1990.").
 
 
 82
 The bare financial facts of this case shine a light on the corrupting incentives of this arrangement: we see aggressive but marginal claims asserted on dubious jurisdiction to seize charitable funds raised for the relief of abject orphans in an impoverished country, so that the money can be diverted for expenditure by the Department of Justice.
 
 
 83
 Congress recently passed legislation reforming certain features of the forfeiture statutes; the new legislation shifts the burden of proof to the government and raises the legal standard for seizures before conviction. See e.g., Civil Asset Forfeiture Reform Act of 2000, H.R. 1658, 107th Cong. (1999); 146 Cong. Rec. S1753-02 (daily ed. March 27, 2000) (Statement of Sen. Leahy) (noting that reforms are designed to temper "prosecutorial zeal" which "skirts the boundaries of due process, leading to the taking of private property regardless of whether the owner is innocent of, or even cognizant of, the property's use in an illegal act, or whether the seizure is entirely out of proportion to the criminal conduct alleged."). The use of forfeiture proceeds by the Department of Justice for self-budgeting is a feature of the statute that also may merit congressional attention. See United States v. Daccarett, 6 F.3d 37, 56 (2d Cir. 1993) (noting that "at this stage in the development of forfeiture law" much needed revisions "must come either from the Supreme Court or from congress.").
 
 CONCLUSION
 
 84
 The judgment of the district court is reversed. We remand for entry of an order promptly releasing all of the funds seized to the claimant, the Asociacion. At oral argument, the government conceded that the claimant would recover interest if the claimant succeeded in recovering the corpus. As to the recoverability or computation of interest, we express no view. See e.g., United States v. $277,000, 69 F.3d 1491, 1493-98 (9th Cir. 1995).
 
 
 
 Notes:
 
 
 [1]
 We have not reviewed these investigations. However, Wetterer continues to enjoy a presumption of innocence, as the district court noted, and the Board cannot be faulted for crediting the results of investigations conducted by the Guatemalan government.