<partyblock>

Alexander Gliklad, Petitioner,

against

Oleg Deripaska, Respondent.

652641/2015

Thomas J. Quigley

W. Gordon Dobie

Thomas J. Quigley

Nicholas R. Alioto

Attorneys for Petitioner Alexander Gliklad

James M. Altman

Howard M. Rogatnick

Attorneys for Respondent Oleg Deripaska

Anil C. Singh, J.

Petitioner Alexander Gliklad ("Gliklad") moves pursuant to CPLR 3212 for summary judgment in this special proceeding pursuant to CPLR 5201 and 5227 against respondent Oleg Deripaska ("Deripaska") contending that: 1) under CPLR 301, Deripaska is subject to general jurisdiction as he is the "alter ego" of a New York corporation; and 2) under CPLR 302(a)(1), Deripaska is subject to specific jurisdiction based on Deripaska's actions in Russia and England intended to prevent Gliklad from prevailing in the underlying action against Michael Cherney ("Cherney") and to hinder satisfaction of Gliklad's judgment against Cherney (Mot. Seq. 005). Deripaska opposes the motion and cross-moves pursuant to CPLR 3212 for summary judgment dismissing the petition with prejudice.

Gliklad also moves for an order pursuant to CPLR 308(5) authorizing service on Deripaska's New York attorneys upon a finding of jurisdiction (Mot. Seq. 007). Deripaska opposes and cross-moves for a sixty-day extension to answer pursuant to CPLR 404(a) and CPLR 2004.[FN1]

Background

On October 11, 2003, Gliklad and Cherney executed a $270 million promissory note in Russia. In August 2009, Gliklad commenced an action against Cherney in New York Supreme [*2]Court to enforce the note (the "Gliklad proceeding").

While the Gliklad proceeding was pending in New York, Cherney commenced an unrelated lawsuit in a court in London, England against Deripaska seeking $3 billion in damages. That lawsuit arose from conduct in Russia and England.

Cherney and Deripaska executed a settlement agreement dated September 27, 2012 (the "English settlement agreement") resolving their dispute. Annex 1 of the English settlement agreement provided that Deripaska would pay Cherney $200 million over a period of five years. Further, the English settlement agreement provided that any dispute arising under the agreement would be submitted to arbitration in London.

The English settlement agreement provided that Deripaska would take specific actions to assist Cherney in the Gliklad proceeding, including: 1) blocking witnesses for the Gliklad proceeding; 2) providing documents to Cherney; 3) meeting in London with Cherney's representatives and his New York legal team; and 4) contacting individuals in Russia to sign affidavits on Cherney's behalf (see English settlement agreement, Clause 4). Additionally, Deripaska would use his best efforts to assist Cherney in the Gliklad proceeding and would supply certain documents to Cherney (id., Article 9.9, Annex 11).

In a memorandum opinion dated March 26, 2014, Justice Melvin Schweitzer awarded summary judgment in favor of Gliklad and against Cherney in the Gliklad proceeding (Gliklad v. Cherney, 2014 WL 1398229 (Sup. Ct., NY Cty., Mar. 26, 2014)). The New York County Clerk entered a judgment in favor of Gliklad and against Cherney in the sum of $505,093,442.18 on April 15, 2014. An amended judgment was entered on November 4, 2015, in the amount of $385,469,699.49, reflecting interest through March 4, 2014.

Thereafter, Justice Schweitzer issued an order dated July 28, 2014 (the "turnover order"), stating, "[I]t is ordered that [Gliklad's] motion for an order declaring that he has the right to all debts and obligations due and owing to [Cherney], and the right to receive payment thereof, from Iskander Makmudov and Oleg Deripaska, is granted."

In May 2014, Deripaska received a restraining notice in Russia from Gliklad. In response, Deripaska asserted that New York lacks personal jurisdiction.

On July 28, 2015, Gliklad commenced this proceeding pursuant to CPLR 5201 and 5227 for turnover of the settlement payments Deripaska was obligated to make to Cherney pursuant to the English settlement agreement. Gliklad contends that Cherney failed to pay Gliklad two $25 million installments from Deripaska in accordance with Justice Schweitzer's turnover order.

In his petition, Gliklad contends that the actions Deripaska took in Russia and England to assist Cherney were aimed at New York and were directly related to the Gliklad proceeding. Gliklad asserts that, by working with Cherney to defeat collection of amounts under the English settlement agreement, Deripaska tortiously interfered with Gliklad's enforcement of his judgment. Deripaska disputes these claims.

Discussion

There are three issues before the Court: first, whether New York is Deripaska's domicile; second, whether Deripaska is subject to general jurisdiction pursuant to CPLR 301 under the doctrine of "piercing the corporate veil" as the "alter ego" of a New York corporation; and third, whether Deripaska is subject to specific jurisdiction pursuant to CPLR 302(a)(1) based on Deripaska's actions in Russia and England having an impact or effect on the Gliklad proceeding [*3]in New York, including the shipping of documents from a law office in London to New York.

A plaintiff must assert a basis for obtaining jurisdiction under the CPLR and defend the exercise of jurisdiction as in accordance with the "traditional notions of fair play and substantial justice" required by the Due Process Clause of the United States Constitution (see International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 [1945]). As the moving party, it is petitioner's burden to show that jurisdiction is proper (Stewart v. Volkswagen of America, Inc., 81 NY2d 203, 207 [1993] ("plaintiffs have the burden of proving satisfaction of statutory and due process prerequisites").

General jurisdiction exists when a defendant is "present" in New York. In Daimler AG v. Bauman, 134 S.Ct. 746 [2014], the United States Supreme Court stressed that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there" (Daimler, 134 S.Ct. at 760). Therefore, "[f]or an individual, the paradigm forum for the exercise of jurisdiction is the individual's domicile; for a corporation, it is an equivalent place," such as its "place of incorporation and principal place of business" (id.).

I. General Jurisdiction Over Deripaska as an Individual under CPLR 301 and Daimler

Gliklad asserts that Deripaska owns residential properties at 12 Gay Street and 11 East 64th Street in Manhattan. If either property is Deripaska's place of domicile, this Court has jurisdiction over Deripaska based on the straightforward rule of Daimler.

There is a critical difference between place of residence and place of domicile. "Residence means living in a particular place, while domicile means living in that locality with intent to make it a fixed and permanent home" (Patton v. Malychev, 132 AD3d 829, 830 [2d Dept., 2015] (internal quotation marks and citations omitted)).

It is undisputed that Deripaska was born in Russia, and Russia is his domicile of origin. That Deripaska is only a citizen of Russia is also undisputed.

Deripaska states in a declaration that the only passports he has held are Russian; he resides in the Krasnodar region in Russia, which has been his primary residence since 2003; and he has voted for public officers in Russia, which is the only country in whose political elections he has ever voted (Declaration of Oleg Deripaska, dated June 3, 2016 ("Deripaska Dec.")). He has only had drivers' licenses issued by Russia; the only place he has ever paid income taxes based upon residency or domicile is Russia; he has bank accounts and brokerage accounts in his name in Russia, but he has no bank or brokerage accounts in his name in New York; and he has a land-based phone number in Russia, but he has never had a land-based phone number in New York (id.). Further, Deripaska has been a public representative of Russia in certain diplomatic and trade organizations, such as the Asia-Pacific Economic Cooperation Business Summit, the Asia-Pacific Economic Cooperation Advisory Council, the G8 summit and the G20 summit, and he has a diplomatic passport from Russia, and on occasion he has represented the Russian government in countries outside Russia (id.).

The First Department examined the issue of general jurisdiction based on domicile in Magdalena v. Lins, 123 AD3d 600 [1st Dept., 2014]. Plaintiff/attorney commenced an action against defendant/attorneys, alleging breach of an oral fee sharing agreement. The Court held that there was no basis for general jurisdiction over a corporation or an individual. The Court [*4]wrote:

Among other things, there is no basis for general jurisdiction pursuant to CPLR 301, since Glendun is not incorporated in New York and does not have its principal place of business in New York. Similarly, no jurisdiction lies pursuant to CPLR 301 over Glendun's founder, defendant Eduardo Lins. While Lins, a Brazilian national, owns an apartment in New York, he is not domiciled there. His daughters regularly reside there. Lins resides and is domiciled in Uruguay; New York is not his domicile. Plaintiff cites insufficient facts to demonstrate any other basis for general jurisdiction over either defendant.

(Magdelena, 123 AD3d at 601).

Deripaska emphasizes that his access to New York is blocked because of a visa problem. Although he has been able to enter New York on a diplomatic visa, his visits to New York since 2009 have been limited to ten trips for a total of less than 30 nights. When he was directed by the court to make an effort to attend a trial as a witness in a case in New York in the Fall of 2015, he applied for a visa, but his request was denied (Deripaska Dec., para. 21). Deripaska maintains that in considering whether he is "at home" in New York, the Court should consider that he cannot enter New York at will.

Deripaska also maintains that he is not "at home" in New York, for he does not own the two Manhattan properties. Rather, the properties are owned by two special purpose corporations that are 100% owned by the Lares trust, a British Virgin Island trust established by Deripaska in 2006 (Deripaska Dec., paras. 8-10; Declaration of Pavel Ezubov, dated June 6, 2016, paras 3-4).

Considering the totality of the circumstances, the Court finds that Gliklad has not met his burden under Daimler of showing that Deripaska is individually domiciled in New York. On this record, there is ample evidence that Russia is Deripaska's fixed and permanent home. Accordingly, the Court finds that there is no jurisdiction over Deripaska individually under CPLR 301 on the basis of domicile.

II. General Jurisdiction over Deripaska under CPLR 301 based on the Doctrine of Piercing the Corporate Veil

Gliklad alleges that Deripaska owns, dominates and/or controls Basic Element, Inc. ("Basic Element"), a New York corporation. Further, Gliklad asserts that the corporate veil should be pierced to obtain personal jurisdiction over Deripaska as the "alter ego" of the corporation. Gliklad maintains that Deripaska is "doing business" in New York through a voluntary, continuous and self-benefitting course of general business contacts.

First, Gliklad contends that Deripaska has been the "de facto" plaintiff in two New York litigations against his New York bankers. Gliklad asserts that Deripaska, via his offshore shell corporation, Veleron Holding B.V., sued B.N.P Paribas (and other banks) in New York federal court "out of principle," and Morgan Stanley in New York state court regarding an investment made in Magna International, Inc., a Canadian automotive parts manufacturer Veleron Holding, B.V. v. BNP Paribas SA, No. 12-cv-05966-CM-RLE (S.D.NY); Veleron Holding B.V. v. Morgan Stanley, index number 652944/2014 (Sup. Ct., NY County).

Second, Gliklad contends that Deripaska personally agreed to "support" Mr. Wolfensohn and invest in his New York hedge fund, Wolfensohn Capital. His investment was made through other of Deripaska's offshore shell companies, Catona Commercial Ltd. (the listed subscriber), with Deripaska identified as beneficial owner.

Third, Gliklad contends that Basic Element, which is based in New York, is the alter ego of Deripaska. Gliklad alleges that Basic Element is: 1) a Delaware corporation with its principal place of business at 660 Madison Avenue in Manhattan; 2) registered to conduct business in New York; 3) owned 100% by Basic Element of Russia, which, in turn, is 100% owned by Deripaska; and 4) maintains bank accounts in New York.

Gliklad alleges that the Basic Element office on Madison Avenue functions as a private office for Deripaska and that Deripaska was involved in remodeling the office, as well as deciding to fire the former secretary and to hire a new one. Gliklad alleges that Deripaska hired a senior executive, Michael Gurfinkel of New York, who worked at the Madison Avenue office and reported to Deripaska on a variety of projects for Basic Element, Veleron, Catona Capital, and other Deripaska businesses, including the dealings with Wolfensohn Capital and the purchase of a New York newspaper. Further, Gliklad contends that Deripaska asked his other U.S. executives who worked as contractors (Adam Waldman and Andrew Youmans) to work on various New York business issues and even hiring, and Deripaska and Waldman each have New York cell phones and AT & T accounts paid for by Basic Element of New York.

Gliklad maintains that Deripaska and his alter ego have a New York presence, millions of dollars in revenue, and are New York landlords. Based upon a 10-year, $1.4 million-per-year lease for the property on Madison Avenue, and two subleases for the space generating more than $6 million, Gliklad asserts that Deripaska collected $2.5 million as a landlord in 2013.

Gliklad asserts that monies that were generated by Basic Element as landlord together with monies from a publicly-traded company, Rusal, were then commingled and used for the various expenses of the New York office, and Deripaska personally. According to Gliklad, Deripaska has further benefitted by having his New York agent, Olga Shriki, in charge of thousand of dollars of personal shopping every month
the newspaper's New York based managing entity
with its U.S. operations in New York.

Deripaska asserts that Gliklad has failed to present admissible evidence to controvert the evidence presented in three sworn statements of persons with personal knowledge that Basic Element is not his alter ego, because he does not dominate the operations of the company, nor has he used such alleged dominance over the company to defraud or wrong Gliklad.

Deripaska asserts that he is not the plaintiff in the Veleron lawsuits; does not own the Wolfensohn investment; and had no involvement in choosing the location for Rusal's United States subsidiary. Further, Deripaska visits New York infrequently, and he rarely uses the Basic Element office during such trips; Rusal's monies have not been commingled with Basic Element's funds; and Gliklad's allegation that Deripaska was involved in the decisions to hire Olga Shriki, to fire the former secretary of Basic Element, and to fire Olga Shriki's predecessor, Mikhail Gurfinkel, are flatly contradicted by the sworn testimony of individuals with personal knowledge (specifically, Shriki, Deripaska and Leontev). Mikhail Gurfinkel, the president of Basic Element and its sole director, was not Deripaska's personal agent; was not supervised by Deripaska; did not report to Deripaska; and, when asked at his deposition about Gurfinkel's activities, Deripaska lacked knowledge about Gurfinkel's activites. Finally, Gurfinkel, not Deripaska, was involved in signing, on behalf of Basic Element, an agreement to invest in the Russian language newspaper, and Deripaska denies that he ordered Gurfinkel to make the investment.

Alter ego liability and the related doctrine of piercing the corporate veil involve the abuse of the corporate form to the detriment of third parties. The Court of Appeals summarized the doctrine in Matter of Morris v. New York State Dept. of Taxation and Fin., 82 NY2d 135 [1993]. The Court wrote:

Generally, ... piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.

While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required. The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.

(Matter of Morris, 82 NY2d at 140-143 (internal citations and quotation marks omitted)).

Here, the transaction Gliklad seeks to attack is the English settlement agreement. However, Gliklad fails to allege that Basic Element was a party to that agreement or derived any benefit from it. The petition does not allege that Basic Element was used as a conduit for documents from Deripaska to Cherney. Accordingly, insufficient facts are alleged to pierce the corporate veil of Basic Element.

Gliklad argues that he is not required to prove fraud by Deripaska to establish jurisdiction based on an alter ego theory. Gliklad contends that New York law will disregard the corporate form where the corporation is shown to be the alter ego, and the failure to recognize this would result in an inequity. To support his position, Gliklad cites a number of cases, including, among others, Island Seafood Co., Inc. v. Golub Corp., 303 AD2d 892 [3d Dept., 2003]; Williams v. Lovell Safety Mgmt, 71 AD3d 671 [2d Dept., 2010]; Pebble Cove Homeowners v. Fidelity New York, 153 AD2d 843 [2d Dept., 1989]; Itel Containers Int'l v. Atlantrafik Express, 909 F.2d 698 [2d Cir. 1990]; Port Chester Elec. v. Atlas, 40 NY2d 652 [1976]; Walkofsky v. Carlton, 18 NY2d 414 [1966]; and Gartner v. Snyder, 607 F.2d 582 [2d Cir., 1979].

This set of cases stands for the axiomatic principle that New York courts possess the authority to pierce the corporate veil under two circumstances: 1) to prevent fraud; or 2) to achieve equity, even absent fraud, in a situation where a shareholder or individual totally dominates the corporation and abuses the corporate form to wrong others. None of the cases cited above concern jurisdiction.

Notably, Gliklad has not cited any cases from the First Department that support his position. By contrast, Deripaska cites a case from the First Department that is at odds with the cases cited by Gliklad.

The First Department examined whether the corporate veil could be pierced to obtain jurisdiction over a defendant in Shaltiel v. Wildenstein, 288 AD2d 136 [1st Dept., 2001]. The defendants in Shaltiel were Daniel Wildenstein ("Wildenstein"), a French national who resided in Switzerland, and Wildenstein Institute (the "Institute"), a not-for-profit entity organized as an association under French law, with no offices or operations in New York. Wildenstein was the president of the Institute.

Plaintiffs owned a painting, purportedly a Modigliani artwork, which was consigned to a London auction house for sale at an auction (Shaltiel, 288 AD2d at 137). When the auction house received a fax from the Institute's Paris office from an individual claiming the painting was a forgery, the auction house withdrew the painting from the auction (id.). Plaintiffs then commenced an action against Wildenstein and the Institute sounding in tortious interference with contract (id.).

Defendants moved to dismiss for lack of personal jurisdiction, and the Court referred the jurisdictional issue to a Special Referee. The Special Referee noted that discovery had been supplied by a New York art gallery, Wildenstein & Co. (the "Gallery"), and that the gallery paid some expenses of the Institute (id.). Based on those facts, the Special Referee found the Gallery to be an alter ego of the Institute (id.). Further, the Special Referee also found that Wildenstein's non-compliance with aspects of discovery under the color of the French "blocking statute" provided an equitable basis to subject the individual defendant to the court's jurisdiction (id.). The motion court granted plaintiff's motion to confirm the Special Referee's report [*6]recommending that personal jurisdiction be found over defendants (id.). The First Department unanimously reversed, writing:

There is an insufficient nexus with New York to subject the Institute to our jurisdiction. The evidence provided by plaintiffs is inadequate to justify disregarding the separate legal existence of the Institute and the Gallery. This evidence does not establish the complete domination of one entity by the other with respect to the transaction being challenged to justify piercing the veil, and that such domination was used to perpetrate a wrong against the plaintiff causing the plaintiff's injury. There is no evidence that the Gallery abused the privilege of doing business in the corporate form to perpetrate the harm such as would invoke exercise of the court's equity jurisdiction.

(Shaltiel, 288 AD2d at 137 (internal citation omitted)).

As Shaltiel clearly demonstrates, the First Department will not allow a plaintiff to pierce the corporate veil as a basis for personal jurisdiction over a defendant unless there is some evidence that the defendant used the corporate form to harm or defraud a party. As in Shaltiel, there are no allegations that the corporation in issue, Basic Element, was ever used to injure or defraud Gliklad. Thus, even assuming for the sake of argument that Basic Element was the alter ego of Deripaska, the allegations are insufficient as a matter of law as a basis for jurisdiction over Deripaska.

Finally, Gliklad's argument that Derispaska is subject to New York general jurisdiction based on his alleged systematic and continuous New York business dealings is unpersuasive for two reasons. First, Gliklad refers to Deripaska as the "de facto" plaintiff in the Veleron litigations. The phrase "de facto" itself tacitly acknowledges that Deripaska is not, in fact, a named plaintiff.

Second, Gliklad uses a shotgun approach to show systematic and continuous business dealings by Deripaska in New York. In other words, Gliklad contends that if the Court adds up the Veleron litigations; ownership of properties, a newspaper, and a hedge fund; Basic Element; a handful of visits to New York; and Rusal's office in New York, a critical mass or tipping point is reached bringing jurisdiction to fruition.

Gliklad's argument is meritless. The United States Supreme Court held in Daimler AG v. Bauman, supra, that the paradigm jurisdiction for an individual is his or her place of domicile. Gliklad's approach invites this Court to gingerly sidestep a landmark decision of the highest court of the land. We decline the invitation.

For the reasons stated above, we hold that Gliklad has not met his burden to establish jurisdiction under CPLR 301.

III. Longarm Jurisdiction under CPLR 302(a)(1)

The First Department summarized long-arm jurisdiction in C. Mahendra (NY), LLC v. National Gold & Diamond Center, Inc., 125 AD3d 454, 457 [1st Dept., 2015). The Court wrote:

CPLR 302(a)(1) authorizes the assertion of long-arm jurisdiction over a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR 302(a)(1) is a "single act statute"; accordingly, physical presence is not required and one New York transaction is sufficient for personal jurisdiction. The statue applies where the defendant's New York activities were [*7]purposeful and substantially related to the claim. "Purposeful" activities are defined as "those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

(internal citations omitted).

Gliklad asserts that Deripaska purposefully injected himself into New York and participated in the Gliklad proceeding by: 1) personally calling each of five witnesses identified in the English settlement agreement (who had been Gliklad's witnesses) and requesting them to give Cherney assistance in connection with his defense to the Glilkad proceeding in this Court; 2) sending each witness a letter confirming and repeating his desire that they provide Cherney assistance; 3) arranging meetings for the witnesses to provide assistance to Cherney's five New York lawyers; 4) paying for his own lawyers in Moscow and London to attend meetings with Cherney's New York lawyers, meet with witnesses, review drafts of documents for use in these New York proceedings, and work on areas of possible assistance
via telephone, e-mail and facsimile," the Court of Appeals held that the client transacted business in New York by "projecting himself" into the New York legal services market, purposefully establishing a long-term attorney-client relationship, and thereby availed himself of the benefits [*8]and protections of New York law, all of which gave rise to the claim being sued upon by the attorney (id.).

Fischbarg is readily distinguishable. Here, the alleged New York activities are not substantially related to the claims as there is no relationship alleged between Gliklad, the petitioner, and Deripaska, the respondent (see C. Mahendra, 125 AD3d at 457). The parties never corresponded by e-mail, telephone or facsimile. There is no evidence that Gliklad transacted any business with Deripaska in New York. Further, the alleged activities of Deripaska in New York are not substantially related to Gliklad's turnover claim.

Gliklad's reliance on Fischbarg is also misplaced, as the case is based on the first prong of CPLR 302(a)(1) concerning "transacting business" in New York. The case is not based on the second prong of CPLR 302(a)(1) concerning "contracts anywhere to supply goods or services in New York."

Similarly, in Deutsche Bank, 7 NY3d 65 (2006), defendant Montana Board of Investments ("MBOI"), a Montana state agency, used an electronic messaging system to negotiate and consummate a bond transaction with Deutsche Bank Securities, Inc. ("DBSI"). When MBOI cancelled the transaction, DBSI commenced an action in Supreme Court alleging breach of contract (Deutsche Bank, 7 NY3d at 70). The Court dismissed the case based on lack of jurisdiction. The Appellate Division reversed, finding that jurisdiction existed and granting DBSI's motion for partial summary judgment as to liability.

The Court of Appeals affirmed, holding that long-arm jurisdiction existed under CPLR 302(a)(1) as MBOI had intentionally projected itself into New York to conduct business transactions. The Court noted that technological advances in communications allow parties to transact voluminous business within the state without physically entering it (Deutsche Bank, 7 NY3d at 71). A critical factor in the Court's analysis was the fact that MBOI knowingly initiated and pursued the negotiation with a DBSI employee in New York that resulted in the sale of $15 million in bonds (id.). In addition, the Court found that MBOI availed itself of the benefits of conducting business in New York, and had sufficient contacts with New York to authorize jurisdiction over its person, in light of the fact that MBOI had engaged in several other bond transactions with DBSI's employee in New York over the previous 13 months (id.). Another factor considered by the Court was that MBOI was a sophisticated institutional trader whose stated mission was to negotiate substantial financial transactions.

Here, unlike Deutsche Bank, there is no factual basis for concluding that Deripaska projected himself into New York. There are no allegations that Deripaska sent any e-mails, telephone calls or facsimiles to New York to assist Cherney. Phone calls were made from Russia to witnesses in Russia or other foreign nations. There are no allegations that Deripaska sent letters to witnesses in New York, or that he arranged meetings of witnesses in New York. Payments were made to lawyers not in New York, but in Moscow and London. Documents were gathered in London and Russia, not in New York. In one instance, Deripaska wrote to a fiduciary in Cyprus. The present facts are in sharp contrast to the facts in Deutsche Bank.

Furthermore, in contrast to the volitional actions taken by the defendants in Fischbarg, and Deutsche Bank, Deripaska did not purposefully project himself into the Gliklad proceeding being litigated in New York. The proceeding in London was commenced by Cherney. At the outset, it is important to note that the English settlement agreement does not state where services [*9]were to be provided, or where documents were to be shipped. Deripaska's actions were taken at the behest of Cherney and as a condition to settle a suit in London governed by English law and did not "arise from his invocation of the privileges and benefits of our State's laws" (Ehrenfield v. Bin Mahfouz, 9 NY3d 501, 511 (2007)). In short, Deripaska could not have reasonably expected to defend his actions in New York.

IV. Whether Deripaska Contracted to Provide Goods or Services in New York

Relevant to this court's inquiry as to whether Deripaska contracted to supply goods or services in New York is Etra v. Matta, 61 NY2d 455 (1984), where plaintiffs' decedent suffered from a heart condition for which he sought treatment from a Massachusetts physician. During the course of the patient's care, which included a period of hospitalization in a Boston hospital, the physician prescribed Aprindine, an experimental drug (Etra, 61 NY2d at 457). Following decedent's discharge, he returned to New York, where he came under the care and treatment of a New York physician, to whom the Massachusetts physician had referred him (id.). Because decedent's treatment involved the continued use of Aprindine, available only from a clinical investigator like the Massachusetts physician, decedent was provided with a supply of the drug to take back to New York (Etra, 61 NY2d at 458).

Asserting that decedent's death was caused by a side effect of the experimental drug, plaintiffs commenced an action against the drug manufacturer and the New York physician (id.). When the New York physician sought to implead the Massachusetts physician, the Massachusetts physician moved to dismiss the third-party complaint on the ground that his contacts with New York were insufficient to require him to defend a medical malpractice action in New York (id.).

The Court of Appeals held that there was no basis for the exercise of jurisdiction over the Massachusetts physician, writing:

It is ... urged that Dr. Lown's provision of Aprindine forms the basis for jurisdiction under the recent amendment to CPLR 302 (subd [a], par 1), which provides for personal jurisdiction when a nondomiciliary "contracts anywhere to supply goods or services in the state" where the cause of action arose out of the contractual relationship. Even if we were to assume that a legal obligation existed for Dr. Lown to continue to supply Aprindine to plaintiffs' decedent, the statute was not meant, in our view, to cover a transaction of this nature.

. . .

The incidental provision of a drug, as part of a course of treatment rendered in another State, cannot be said to fall within the contemplation of the statute so as to confer personal jurisdiction over the physician.

(Etra, 61 NY2d at 459).

Here, as in Etra, Deripaska provided Cherney with something that entered New York only incidentally. Cherney and Deripaska executed the English settlement agreement for the central purpose of ending their litigation. Like the medication that was provided by the doctor in Etra, the documents that were provided by Deripaska were incidental.

The decision of the First Department in Royalty Network, Inc. v. Harris, 95 AD3d 775 [1st Dept., 2012], illustrates that courts should hesitate to find jurisdiction based on the provision of goods and services under CPLR 302(a)(1) where a contract does not state that performance must take place in New York. A New York music publishing corporation commenced an action against a Georgia resident for a dispute arising from an executive producer agreement which required defendant to produce, market, promote and distribute an album and two music videos (Royalty, 95 AD3d at 776). The motion court granted defendant's motion to dismiss for lack of personal jurisdiction (id.).

The First Department affirmed, holding that the plaintiff failed to make a sufficient showing of conduct by which the defendant purposefully availed himself of the privilege of transacting business so as to invoke the benefits of New York's laws (id.). While the defendant was required to send a completed album to plaintiff in New York, the Court emphasized that the agreement contained no geographic qualifications at all (Royalty, 95 AD3d at 775). The Court reasoned that there was nothing to show that the defendant intended to take advantage of New York's unique resources in the entertainment industry (id.).

The present case is analogous in two significant respects. First, there are no express geographic qualifications in the English settlement agreement. Second, like the defendant who sent the album to New York, there is nothing showing that Deripaska intended to take advantage of New York's unique resources.

Both New York state courts and federal courts have held that the shipment of documents to New York, without more, is insufficient to confer personal jurisdiction. For example, in Faravelli v. Bankers Trust Co., 85 AD2d 335 [1st Dept., 1982], the Court wrote:

The mailing of a draft or documents to New York for payment does not rise to the level of activity contemplated by CPLR 302 as a basis for personal jurisdiction.

(Faravelli, 85 AD2d at 338).

Likewise, in Benifits by Design Corp. v. Contractor Mgt. Servs., LLC, 75 AD3d 826 [3d Dept., 2010], the Court wrote:

Here, the actions by which plaintiffs contend defendant breached a duty took place in Arizona, with the single exception of defendant's shipment of documents to plaintiffs in New York. While one such transaction may be sufficient if the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted, we do not find that the sole action of shipping a package of documents to New York, without more, demonstrates that defendant availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

(Benifits, 75 AD3d at 929) (internal citations and quotation marks omitted).

Finally, in BHC Interim Funding, LP v. Bracewell & Patterson, LLP, 2003 WL 21467544 (S.D.NY, June 25, 2003), the Court held that an allegation "that certain documents were delivered by [defendant] Bracewell to BHC's attorneys or representatives in New York" was insufficient to constitute transaction of business or agreement to provide goods and services [*10]in New York under CPLR 302(a)(1).

Long-arm jurisdiction under the goods and services prong of CPLR 302(a)(1) has been sustained where defendant has done more than the incidental shipment of documents. For example, in LHR, Inc. v. T-Mobile USA, Inc., 88 AD3d 1301 [4th Dept., 2011], a debt collection agency commenced an action for breach of contract and negligence against a seller of delinquent customer accounts and the seller's parent corporation. The Supreme Court denied a motion to dismiss, holding that the seller, a Delaware corporation with a chief executive office in Pennsylvania, was subject to long-arm jurisdiction in New York.

The Appellate Division affirmed, holding that defendant's sales to plaintiff of delinquent customer accounts rendered it subject to the court's jurisdiction under CPLR 302(a)(1) because defendant "contract[ed] ... to supply goods or services" in New York (LHR, 88 AD3d at 1302). The 28 purchase agreements in issue explicitly and specifically stated that all accounts and all records reasonably requested by plaintiff "shall be delivered to plaintiff" (id.). Based on such unambiguous contractual language, the Court found that the contracts contemplated the delivery of goods into New York, the location of plaintiff's chief executive office.

In LHR, the parties entered into an agreement for the sole purpose of selling delinquent accounts. The accounts and related records to be delivered to New York were the focal point of the transaction. By contrast, Deripaska's agreement to supply documents to Cherney was but one of many obligations under the English settlement agreement.

At oral argument, it was conceded that Deripaska's solicitor shipped documents directly to Cherney's attorney in New York (Oral Arg. Transcript, pp. 29-30). Deripaska's counsel emphasized, however, that the documents were shipped to New York only as an accommodation to Cherney's attorney. The mere mailing of documents from London to New York without more is insufficient to constitute that Deripaska contracted to supply goods or services in New York.

Gliklad contends that his $150 million claim arises from the very agreement whereby Deripaska agreed to provide services in New York in exchange for a discount of hundreds of millions of dollars from Cherney. Gliklad asserts that, pursuant to Clause 4 of the English settlement agreement with Cherney, Deripaska "contracted ... to supply goods or services in the state" and is thus subject to jurisdiction. Specifically, Gliklad argues that Deripaska expressly agreed to provide goods or services in the Supreme Court of New York.

It is crucial to note that the English settlement agreement does not require Deripaska to ship documents to New York or provide any services in New York. Except for the shipment, all other actions taken by Deripaska occurred outside New York.

On this record, we find that Gliklad has failed to carry his burden to demonstrate Deripaska is subject to specific jurisdiction under CPLR 302(a)(1).

Accordingly, it is

ORDERED that petitioner's motion for summary judgment is denied; and it is further

ORDERED that respondent's cross-motion for summary judgment is granted, and the petition is dismissed with prejudice; and it is further

ORDERED that petitioner's motion authorizing service on Deripaska's New York attorneys (mot. seq, 007) is denied as moot; and it is further

ORDERED that respondent's cross-motion for a sixty-day extension to answer is denied as moot.

The foregoing constitutes the decision and order of the court.

Date: April 25, 2017

New York, New York

______________________________

Anil C. Singh

Footnotes

Footnote 1:Motion sequence 005 and 007 are consolidated for disposition.

<form method="LINK" action="../../slipidx/com_div_idxtable.shtml">

<input type="submit" value="Return to Decision List">

</form>

</partyblock>